Herbert G. Grey, OSB #810250
4800 SW Griffith Drive, Suite 320
Beaverton, OR 97005-8716
Telephone: 503-641-4908
Email: herb@greylaw.org

Jessica Hart Steinmann (*pro hac vice application forthcoming*)
Email: jsteinmann@americafirstpolicy.com
Leigh Ann O'Neill (*pro hac vice application forthcoming*)
Email: LOneill@americafirstpolicy.com
Andrew Zimmitti (*pro hac vice application forthcoming*)
Email: azimmitti@americafirstpolicy.com
Sarah Heath (*pro hac vice application forthcoming*)
Email: sheath@americafirstpolicy.com
Garrett Greene (*pro hac vice application forthcoming*)
Email: ggreene@americafirstpolicy.com
AMERICA FIRST POLICY INSTITUTE
1455 Pennsylvania Ave N.W., Suite 225
Washington, D.C. 20004
Telephone: 703-755-0944

*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
### Portland Division

ALEXA ANDERSON and REESE ECKARD

    *Plaintiffs*,

       v.

OREGON SCHOOL ACTIVITIES ASSOCIATION,

    *Defendant.*

Case No. _____

**Complaint for Declaratory and Injunctive Relief and Damages**
**42 U.S.C. § 1983**

**Jury Trial Demanded (Damages)**

## I.    INTRODUCTION

1. On May 31, 2025, Plaintiffs Alexa Anderson and Reese Eckard achieved their years-long goal of competing and medaling in high jump during the women's 2025 Oregon State Track and Field Championships held at Hayward Field in Eugene, Oregon. But their struggle was not just to achieve success in the outcome of their athletic events—it was also to stand up for fairness and equal opportunity for women in athletic competition.

2. When Alexa and Reese saw that a biological male who had competed against them in the women's State Championships for high jump finished on the podium next to them, Alexa and Reese made the decision together to step down from the finishing podium during the awards ceremony and, through that act, in silence, expressed their fundamental disagreement with the Oregon School Activities Association's ("OSAA") policies and rules permitting biological males to compete in women's sports.

3. Their fateful decision and form of nonverbal expression, protected by the First Amendment, were not given the same respect and rights given by OSAA to those who were supportive of OSAA's transgender policies, however. Instead, Alexa and Reese were shuttled away from the finishing podium by OSAA officials and were not permitted to participate further in the awards ceremony, being wrongfully deprived of their hard-fought opportunity to receive their awards and the recognition of medaling in the State Championships.

4. OSAA's official policy "endeavors to allow students to participate for the athletic or activity program of their consistently asserted gender identity while providing a *fair and safe environment* for all students."[1] In other words, OSAA has made it clear that, in its view, including biological males in

---

[1] OR. SCH. ACTIVITIES ASS'N., 2024–2025 Handbook ("Handbook"), Rule 37: Gender Identity Participation 81. A true and correct copy of the 2024–2025 OSAA Handbook is attached as **Exhibit A.**

female athletics is part of a "fair and safe" playing field.

5. OSAA has expressed this—and other views on controversial social issues like LGBTQ+ rights and gender identity, through its own speech, and has encouraged student-athletes to speak on these topics—so long as the student-athletes express the viewpoint that OSAA approves.

6. In fact, OSAA has a custom of routinely affording transgender-identifying male athletes special treatment at events—departing from standard competition procedures in ways that materially affect fairness and undermine female athletes' trust in the integrity of the competition.

7. Alexa and Reese—accomplished female athletes in their own right—respectfully disagree with OSAA's view that biological males competing against girls is fair. In their view—and in the view of many Americans,[2] allowing biological males into girls' competitions undermines fairness.

8. The First Amendment's protection of freedom of speech extends beyond traditional verbal and written communication; it also protects certain forms of communicative conduct or "symbolic speech." *See, e.g., Texas v. Johnson*, 491 U.S. 397, 400 (1989). "Such expression is an integral part of the development of ideas and a sense of identity. To suppress expression is to reject the basic human desire for recognition and affront the individual's worth and dignity." *Procunier v. Martinez*, 416 U.S. 396, 427 (1974) (Marshall, J., concurring).

9. Alexa and Reese also expressed their belief that allowing biological boys to compete against girls is unfair by wearing t-shirts to the awards ceremony reading "Save Girls' Sports."

10. That expression, like their decision to step down from the finishing podium, was silent and caused no disruption to the awards ceremony.

11. Whatever side of the debate over the integrity of girls' sports one falls on, our Constitution

---

[2] *See* Megan Brenan, *Two-Thirds in U.S. Prefer Birth Sex on IDs, in Athletics*, GALLUP (June 10, 2025), https://news.gallup.com/poll/691454/two-thirds-prefer-birth-sex-ids-athletics.aspx (last visited July 8, 2025) ("Sixty-nine percent of U.S. adults continue to believe that transgender athletes should only be allowed to play on sports teams that match their birth sex").

allows Alexa and Reese the "freedom to differ" with OSAA's viewpoint on a controversial issue. *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642 (1943). Especially on an issue like this that, in Alexa and Reese's view, "touch[es] the heart of the existing order" of women and girls' sports. *Id.*

12. What our Constitution does not permit is what happened here. Faced with a viewpoint it disapproved of, OSAA officials acted swiftly to silence Alexa and Reese, forcing them to take off the t-shirts, moving them away from the awards podium, removing them from the official championship photograph, and punishing them by withholding their medals.

13. But students do not lose their constitutional rights when they cross the finish line. Rather, Alexa and Reese have just as much right to engage in "silent" expression on the "playing field" as they do in the classroom. *Tinker v. Des Moines Indep. Comty. School Dist.*, 393 U.S. 503, 508, 512 (1969). And "[i[f there is any fixed star in our constitutional constellation[,]" it is that state actors—including OSAA—cannot "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia Bd. of Ed.* 319 U.S.at 642.

14. Simply put, if OSAA sees fit to instruct student-athletes on social and political issues like gender identity and endorses the viewpoint that biological males competing against girls is "fair and safe," then it must also tolerate dissenting speech on those same issues.

15. In other words, OSAA cannot have it both ways. It cannot preach "inclusion" on one hand, and on the other hand exclude those who disagree. "A commitment to speech for only *some* messages and *some* persons is no commitment at all." *303 Creative LLC v. Elenis*, 600 U.S. 570, 602 (2023) (emphasis in original).

16. In addition to protecting basic fairness in women's sports, this lawsuit also seeks to

vindicate Alexa and Reese's fundamental First Amendment "freedom to differ" with OSAA's stance allowing biological males to compete against girls in athletics.

## II.    JURISDICTION AND VENUE

17. This is a civil rights action that raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

18. This Court has original jurisdiction over the claims asserted in this Complaint under 28 U.S.C. § 1331, which provides jurisdiction for claims raising questions of federal law, and 28 U.S.C. § 1343(a), which provides jurisdiction for claims seeking vindication of civil rights protected by federal law.

19. This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief pursuant to 28 U.S.C. §§ 2201–02; the requested injunctive relief pursuant to 28 U.S.C. § 1343; and costs and attorneys' fees under 42 U.S.C. § 1988.

20. Venue is proper in this district and this division pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district and division.

## III.    PARTIES

21. Plaintiff Alexa Anderson is a female athlete who graduated from Tigard High School in June 2025. Alexa resides in Tigard, Oregon.

22. Plaintiff Reese Eckard is a female student athlete who participated in OSAA-sanctioned athletics for Sherwood High School during the 2024-2025 school year. Reese Eckard resides in Sherwood, Oregon.

23. Defendant OSAA is the governing body for interscholastic athletic activities for public

and private schools in Oregon. OSAA establishes policies and standards for member schools regarding student participation in high school athletics.

24. A state athletic association is a state actor, and state action principles apply when "[t]he nominally private character of the Association is overborne by the pervasive entwinement of public institutions and public officials in its compositions and workings, and there is no substantial reason to claim unfairness in applying constitutional standards to it." *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n.*, 531 U.S. 288, 298 (2001).

25. Here, 295 full member high schools belong to OSAA. Most of these high schools are public schools. Also, OSAA is governed primarily by public school employees.

26. Thus, OSAA is a "state actor for constitutional purposes." *Nakashima v. Oregon State Bd. of Educ.*, 344 Or 497, 521 n. 26 (2008) (citing *Brentwood Academy* 531 U.S. at 295–302).

27. OSAA's operations are funded primarily by dues from its member school districts, along with additional revenue derived from interscholastic championship events and corporate sponsorships.

28. The OSAA Executive Board is composed of administrators from member schools and school districts. These representatives direct and control the policies and regulations of OSAA.

29. Member schools and districts have ceded operational control of Oregon's interscholastic athletic programs to OSAA, granting it exclusive authority to regulate eligibility, competition, and compliance with state and federal athletic standards.

## IV.    BACKGROUND

### A.    OSAA has Endorsed Viewpoints on Various Social Issues and Has Expressed Support for Only Certain Athlete Protests.

30. OSAA has a long-standing practice of publicly aligning itself with certain social and political causes, particularly those with a purported "progressive" viewpoint.

31.  For example, in October 2020, OSAA joined the Oregon Department of Education and other state education leaders in explicitly endorsing the Black Lives Matter (BLM) movement and telling its education partners that they must "be honest about our racist history as a state" and acknowledge the "systemic racism that still exists in our public education system."[3]

32.  OSAA makes clear that it approves of students and schools openly displaying BLM symbols and messages at OSAA-sanctioned events without fear of discipline and that "[t]he display of the phrase 'Black Lives Matter' or Black Lives Matter symbols in school settings does not violate any state policy or law."[4]

33.  OSAA has even expressed the view and decreed that BLM "is a statement of love and acceptance, not a symbol of hate,"[5] despite BLM's open support for Hamas following its attack on Israel and murder of 1,200 people—mostly Jews—on October 7, 2023.[6]

34.  OSAA has also shown support for students and schools participating in Pride events and displays. For instance, OSAA's Equity and Diversity Newsletter from last June opens by proclaiming, "It's officially Pride Month: here's everything you should know about the global LGBTQ celebration."[7]

35.  OSAA lauds the month as a "commemoration of the lesbian, gay, bisexual, *transgender* and queer community." The newsletter goes on to explain that Pride is "part celebration *part protest*."[8]

---

[3] Oregon State Board of Education et al., *Joint Letter Affirming Black Lives Matter* (Oct. 15, 2020), https://www.osaa.org/docs/osaainfo/BLM%20Joint%20Letter%20October%2014.pdf  (last visited July 9, 2025).
[4] *Id.*
[5] *Id.*
[6] *See, e.g.*, https://www.adl.org/resources/article/fringe-left-groups-express-support-hamass-invasion-and-brutal-attacks-israel
[7] OREGON SCH. ACTIVITIES ASS'N OREGON SCH. ACTIVITIES ASS'N, *Equity Newsletter* (June 2024), https://www.osaa.org/docs/equity/EquityNewsletterJune2024.pdf (last visited July 12, 2025).
[8] *Id.*



36.  Additionally, OSAA's own resources have made clear the kinds of silent protests it

supports.  OSAA's website has a "support and equity resources" tab.[9] On the web page under that tab

is a link to a module called "Sports as a Vehicle for Social Change."

### RISE to WIN
» Rise to Win website
» Positive Coaching Alliance: Sports as a Vehicle for Social Change module
» Positive Coaching Alliance: Equality vs. Equity module
» Understanding Our Identities Workshop, November 18 Follow-Up handout
» Perspective Taking Workshop, February 10 Follow-Up handout
» RISE Leadership Workshop Series
» Perspective Taking Workshop, April 7 Follow-Up handout

37.  In that module is a worksheet with two stated objectives: (1) "Examine examples of

---

[9] OREGON SCH. ACTIVITIES ASS'N, *Equity Training Resources*, https://www.osaa.org/equity/training-resources (last visited July 12, 2025).

professional athletes using sports as a vehicle for social progress" and (2) "Encourage participants to identify ways in which they can use their platform."[10]

38.    The module then goes on to give a handful of impliedly "acceptable" examples of professional athletes protesting perceived racial and social injustice, including using special apparel.

### Marcus Peters, Jimmy Graham and Other NFL Players Wear "Justice for All" Cleats

**September 7 and 10, 2017 (Special Apparel and Collective Action)**





39.    The module closes by asking students, athletes, and athletic department staff to identify ways to "help lead the way in improving race relations and driving social progress," presumably through acts of protest.[11]

40. Beyond that, OSAA has admitted that its rules do not forbid other acts of silent protest. For example, in 2019 a California high school football player kneeled during the national anthem to "bring

---

[10]RISE, *Sports as a Vehicle for Social Change*, https://devzone.positivecoach.org/sites/uploads/files/Sports-as-a-Vehicle-for-Social-Change.pdf  (last visited July 12, 2025).
[11] *Id.*

attention to racial inequality in the United States."[12] When asked to comment on the situation, Peter
Weber—then and current executive director of OSAA, explained that "OSAA *does not* have a formal
policy on kneeling during the national anthem."[13] Rather, OSAA leaves it up to the individual school
districts.

**B.    OSAA's Policy Allowing Biological Males to Compete Against Girls in Athletics.**

41.  Beyond actively promoting gender-identity ideology and other social justice causes like
Pride and BLM, OSAA's policy allows student-athletes to compete in accordance with their asserted
gender identity, regardless of biological sex.

42.  OSAA's policy on Gender Identity Participation ("Transgender Policy") is contained in
its Handbook, which states that it "allow[s] students to participate for the athletic or activity program
of their consistently asserted gender identity while providing a fair and safe environment for all
students." **Exhibit A** at 81 ¶ 37.

43.  The Transgender Policy further provides, in relevant part:

**B. Participation**

2) Subject to section B(1), **once a transgender student has notified the student's
school of their gender identity (boy or girl), the student shall consistently
participate as that gender for purposes of eligibility for athletics and activities,**
provided that if the student has tried out or participated in an activity, the student
may not participate during that same season on a team of the other gender.

3) Subject to section B(1), **once a nonbinary or intersex student has notified the
student's school of their gender identity, the student shall participate as either
gender for purposes of eligibility for athletics and activities that are gender-
segregated or gender-specific**, provided that if the student has tried out or
participated in athletics or an activity that is gender-specific or gender-segregated,
the student may not participate during that same season on a team of the other
gender.

---

[12] Maggie Rasch, *Sophomore Jacob Waterman Becomes First La Salle Athlete to Kneel During National
Anthem, Inspiring Others to Join Him*, THE LA SALLE FALCONER (Sept. 11, 2019),
https://lasallefalconer.com/2019/09/sophomore-jacob-waterman-becomes-first-la-salle-athlete-to-kneel-
during-national-anthem-inspiring-others-to-join-him/ (last visited July 13, 2025).
[13] *Id*.

1.  Q. If a transgender student is transitioning from one gender to another, what is the procedure for that student to access athletics and activities?

    **A:** When a student or the student's parent or guardian, as appropriate, notifies the school administration that the student will assert a gender identity that differs from previous representations or records, **the OSAA will recognize a school's decision to modify the student's eligibility, consistent with the student's gender identity**, subject to section B(2).

**C.      OSAA has a Custom of Materially Changing its Rules to Accommodate Transgender Athletes, Resulting in Disparate Tratment.**

44. OSAA-sanctioned meets involving transgender athletes have departed from standard competition procedures in ways that materially affect fairness and undermine female athletes' trust in the integrity of the event, which also motivated Alexa's and Reese's acts of protest at the State Championships.

45. Competition procedures and rules are supposed to be enforced consistently at every OSAA event by event officials. But irregularities in the application of these rules conferred tangible advantages on biological male athletes and altered the competitive environment for Plaintiffs and other girls in violation of Title IX in events specifically designed to "accommodate" differences between the sexes. 34 C.F.R. § 106.41(c)(1). *See also Castaneda, et al.,* v. *Oregon Department of Education, et al.,* D. Or. Case No. 3:25-cv-01170-SB (filed July 7, 2025).

46.  Rules that have been applied differently for the biological males include the following:

12. EVENT CALL/CHECK IN PROCEDURES:

**B. Field Events**: All field event athletes must check in at the Clerk of the Course tent immediately upon arrival to Hayward Field where they will be told when to report back to the tent to be escorted to the field. **All field event athletes are required to check in BEFORE they can be escorted to the field.** ABSOLUTELY NO CHECKING IN AT THE FIELD EVENT SITE. All participants must check in at least ONE HOUR (1 hour 15 minutes for vertical jumps) prior to the scheduled start of the event. Field event athletes must be back in the Clerk of the Course tent at their designated report time to be escorted to the field for instructions and warmups.

17. EVENT CONDUCT:

. . .

Participants must be warmed up and ready to go when call is given for an event. All trials must be completed within the time periods prescribed. For safety reasons MP3 players, radios, headphones, **cell phones and any other personal communication devices will not be allowed on the track or on the infield of the track.** One warning will be issued to any coach or athlete if found using any type of personal communication device in an event venue. **Any subsequent violation of this rule may lead to disqualification.**

OSAA 2025 Track & Field Administrative Information. (available at: https://www.osaa.org/docs/btf/trackadinfo.pdf) (emphasis added).

47. OSAA administrative rules are required to apply to all competitors and ensure equal treatment, fairness, and consistency during competitions. The check-in processes all girls must go through before entering the field ensure all equipment is within official standards (and no prohibited items are introduced to the competition). Having all competitors go through this process publicly fosters trust in the athletic competition. Additionally, the use of cell phones on the track or on the field is banned event conduct—competitors are subject to "disqualification" if they violate the rule.

48. OSAA's administrative rules have not been applied equally to the transgender-identifying biological male athletes, undermining the competitive spirit of the events, fostering unequal treatment on the basis of sex, and providing male athletes with competitive advantages.

49. For example, in the high jump events held on April 18, 2025, at Newberg High School, a biological male competing in the girls' event was allowed to attempt jumps on his own after the girls had completed theirs, rather than advancing height-by-height in a unified field as the female athletes were required to do. This practice afforded him a competitive advantage over his female competitors, who were instead required to compete against one another in direct, incremental competition.

50. Moreover, unlike the female athletes, this biological male was allowed to bypass pre-meet check-in protocols, including shoe spike inspections and rule briefings. At the 2025 State Championships, all female competitors were required to report to designated tents for inspection and

procedural guidance. But this male competitor was permitted to forgo these required protocols and instead enter the field separately, accompanied by a security escort. This not only violated event protocols but also sent a demoralizing message to the female competitors that different and special rules applied for their male competitor.

51. A separate transgender-identifying biological male was also afforded special treatment in girls' track events held on May 18, 2024, at Hayward Field in Eugene, Oregon. In track events, runners are allowed to warm up about an hour before they must check in at the Clerk's Table, usually located in a tent. The competitors are then required to remain in the tent before the event. They are not allowed to leave, and they cannot go to the field or continue warming up. Additionally, once checked in, coaches are not allowed further communication with the athletes and are not allowed in the tent. Only the athletes and an official are permitted in the tent. The athletes' personal belongings, including cell phones, clothing, and other items also must be stored in the tent.

52. Despite these clear rules, which should have applied to all competitors, this male competitor was allowed to wait outside the tent and was permitted to use his cellphone throughout the competition, while the female competitors were not.

53. The special treatment afforded to these transgender-identifying biological male athletes has altered the character and tone of the competitions and negatively impacted female competitors, including Plaintiffs.

54. Additionally, the presence of heightened security, police officers stationed around the male athletes and their families, and the increased media attention generated by their participation in female-only competitions, created an atmosphere of intimidation, distrust, and stress for the girls, including Plaintiffs.

55. Rather than the celebratory culmination of a season, the Transgender Policy and

Defendants' uneven implementation of it transformed these meets into politically charged and emotionally volatile environments for the girls. Plaintiffs and their female peers reported feeling scrutinized, silenced, and unsupported to OSAA officials, but no action was taken to address their concerns.

**D.    Plaintiffs' Non-Verbal Expression at the 2025 Track and Field State Championships and OSAA's Silencing of Their Views.**

56.  Alexa Anderson and Reese Eckard are accomplished student-athletes who competed successfully at the 2025 Oregon State Track and Field Championships. Through dedication and athletic excellence, Alexa placed third, and Reese placed fourth, earning them well-deserved medals and qualifying them for the championship podium ceremony.

57.  Alexa and Reese also hold sincere beliefs regarding fairness and integrity in women's athletics. Specifically, they believe that OSAA's Transgender Policy allowing biological males identifying as female to compete in female athletics undermines fairness, competitive balance, and equity in girls' sports.

58.  More fundamentally, Alexa and Reese disagree with the Transgender Policy's premise: that a person's subjective identity determines whether a person is male or female, not a person's sex.

59.  Instead, Alexa and Reese believe in a scientific understanding of basic biology. Adhering to this belief, Alexa and Reese believe that there are only two sexes, male and female, and that a person's gender (their status as a boy or girl, man or woman) is inextricably tied to sex.

60.  Motivated by their deeply held beliefs, Alexa and Reese chose to express their viewpoint peacefully and silently at the 2025 State Championships. On May 31, after completing their events and earning their medals, both girls wore T-shirts reading "Save Girls' Sports" as they approached the awards podium, intending only to convey their message quietly, clearly, and respectfully.



61. As Alexa and Reese approached the podium, an official in a blue shirt (pictured below) immediately confronted them, instructing them to remove the shirts and stating that athletes could wear only school-issued apparel at the awards podium.



62. Alexa and Reese were not previously aware of this purported OSAA rule, and on information and belief, no written OSAA rule explicitly mandates only school-issued attire at podium ceremonies. In fact, in previous events, OSAA officials allowed a biological male competing against girls to put on a singlet after the competition, while his female competitors were instructed by OSAA

officials that they could not do so. Further, on information and belief, OSAA has allowed athletes to wear non-school-issued clothing or personal attire during past state championship awards ceremonies without issue.

63. Alexa and Reese respectfully complied with the OSAA official's directive, promptly removing the "Save Girls' Sports" shirts. They then stepped onto the podium in school-issued attire, prepared to receive their medals. But upon stepping onto the podium, Alexa and Reese felt that standing alongside a biological male competitor would implicitly endorse OSAA's viewpoint that biological males competing in female athletics is fair and appropriate.

64. In the words of Alexa: "I just didn't think that it's fair to biological females to allow and encourage biological males to compete among us, not only for myself and the other girl that stepped down, but the girl who should have been on the podium and the girl who didn't even get to go to state because she was beaten by a biological male at districts."[14]

65. In that moment, Alexa and Reese silently and respectfully stepped down from the podium, expressing their conscientious objection to a policy they viewed as unfair. This silent act of protest was symbolic and dignified, intended solely to express their personal convictions quietly, without disruption or interference.

---

[14] Taylor Penley, *Oregon track star wages legal battle against trans athlete policy after medal ceremony protest*, FOX NEWS (June 5, 2025, 4:00 AM EDT), https://www.foxnews.com/media/oregon-track-star-wages-legal-battle-against-trans-athlete-policy-after-medal-ceremony-protest (last visited July 12, 2025).



66. Alexa and Reese's silent protest caused no disruption, distraction, or interruption of the event. During their entire protest—both while wearing their shirts and after stepping down from the podium—no student, coach, or spectator became visibly upset or distracted. No participant objected or complained to Alexa or Reese about their actions.

67. Despite the respectful and non-disruptive nature of Alexa's and Reese's protest, OSAA officials swiftly acted to remove them from the podium area entirely and excluded them from the official awards photographs and presenting of the medals.





© Coach Greene Fotos

68. As of the date of the filing of this Complaint, Alexa has still not received her medal from OSAA.

69. Typically, when athletes cannot be present at podium ceremonies, for instance, due to concurrent events or ties (where there is only one medal for two competitors)—OSAA promptly sends medals directly to the athletes' schools. OSAA did not adhere to this customary practice for Alexa or for Reese.

70. Alexa and Reese know of no other circumstances where athletes did not receive their medals simply because they were not on the podium.

71. Moreover, Alexa and Reese perceived OSAA officials observing them closely throughout the competition, including during pre-competition warm-ups, when a group of female athletes briefly passed around the "Save Girls' Sports" shirt. This increased scrutiny by OSAA on the Alexa and Reese created an environment that intimidated them.

72. Alexa and Reese were humiliated by OSAA's actions at the 2025 State Championship as it appeared for all to see that they were being punished by OSAA for their beliefs. Being publicly removed from the awards podium, excluded from official event photographs, and denied their medals undermined their achievement and stigmatized them publicly. Alexa and Reese lost the opportunity to celebrate their athletic accomplishments in a dignified manner.

73. Alexa and Reese have always respected others' rights to express differing viewpoints, and they continue to do so. Their silent protest at the state championships was intended only as a quiet and respectful affirmation of their beliefs regarding fairness in female athletics. They seek no special treatment, only the constitutionally guaranteed right to express viewpoints that differ from those endorsed by OSAA, without having to suffer punishment—and to compete in an environment where biological males competing against girls are not afforded special treatment by OSAA.

### COUNT I: Violation of the First Amendment—Viewpoint-Based Discrimination
### (U.S. Const. Amends. I, XIV, 42 U.S.C. § 1983)

74. Plaintiffs repeat and reallege each of the prior allegations in this complaint.

75. The First Amendment, as incorporated against the States by the Fourteenth Amendment, protects the freedoms of speech and association. *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986).

76. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). And freedom-of-speech harms become "all the more blatant" when the government "targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995).

77. Indeed, "[a]t the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n v.*

19

*Vullo* 602 U.S. 175, 187 (2024); *see also Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 156 (2015) (viewpoint discrimination is a "'more blatant' and 'egregious form of content discrimination'" (quoting *Rosenberger*, 515 U.S. at 829.).

78. Non-disruptive, private student expression is protected by the First Amendment. *Tinker*, 393 U.S., at 506.

79. Viewpoint-based restrictions, whether in a public or nonpublic forum, are unconstitutional.

80. Time, place, and manner restrictions on speech must be content-neutral, narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.

81. Defendant uses its Transgender Policy and custom of allowing transgender athletes to routinely circumvent official competition rules to prohibit the expression of certain viewpoints without regard to whether the expression materially or substantially disrupts the school, its operations, or its environment, or the achievement of any legitimate pedagogical objective.

82. By conditioning participation benefits such as podium access, official photos, and medals, on acceptance of Defendant's orthodoxy, Defendant imposed an unconstitutional viewpoint-based burden on Plaintiffs' speech.

83. Alexa's and Reese's expression—wearing shirts with the phrase "Save Girls' Sports" in protest of OSAA's Transgender Policy is protected speech.

84. Alexa and Resse's refusal to stand on the awards podium in protest of OSAA's Transgender Policy is protected speech.

85. Defendant's censorship of Plaintiffs' shirts while endorsing opposing viewpoints on related topics is viewpoint discrimination, which is unconstitutional in any type of forum.

86. Defendant's censoring of Plaintiffs' podium protest while endorsing opposing viewpoints

on related topics is viewpoint discrimination, which is unconstitutional in any type of forum.

## COUNT II: Violation of the First Amendment—Retaliation
### (U.S. Const. Amends. I, XIV 42 U.S.C. § 1983)

87.  Plaintiffs repeat and reallege each of the prior allegations in this complaint.

88.  "The First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018).

89. Because state actions cannot "produce a result which [they] could not command directly," *Perry v. Sindermann*, 408 U.S. 593, 597 (1972), the First Amendment also prohibits "retaliation" against students who exercise their rights. Put simply, "[o]fficial reprisal for protected speech offends the Constitution." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citation modified). What action the state took is irrelevant; "the government's *reason* for [acting] is what counts." *Heffernan v. City of Paterson*, 136 S. Ct. 1412, 1418 (2018) (emphasis added). The illegal retaliation can be something "as trivial as failing to hold a birthday party." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 78 n.8 (1990).

90.  Plaintiffs Alexa Anderson and Reese Eckard engaged in protected speech when they: (a) wore "Save Girls' Sports" shirts during the 2025 Oregon State Track & Field Championship awards ceremony; and (b) silently stepped off the podium rather than share it with a biological-male competitor.

91.  OSAA retaliated against Plaintiffs for exercising their First Amendment rights by refusing to allow them to appear in the official championship photos and withholding their rightfully earned medals.

92. These retaliatory actions suppress free speech by creating a chilling effect. Such actions would "lead ordinary students in the plaintiffs' position to refrain from protected speech." *Arizona Students' Ass'n. v. Arizona Bd. of Regents*, 824 F.3d 858, 868 (9th Cir. 2016). Here, student-athletes who disagree with Defendant's Transgender Policy may fear expressing their views because they

believe their medals could be withheld as punishment.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court enter judgment against Defendant OSAA and grant Plaintiffs the following relief:

**(A)**    A declaration that Defendant violated Plaintiffs' rights under the First Amendment by engaging in unlawful viewpoint discrimination when it refused to allow Plaintiffs to wear shirts saying "Save Girls' Sports," and refused to allow Plaintiffs to engage in a silent, non-disruptive act of expression in stepping down from the awards podium;

**(B)**    A declaration that Defendant violated Plaintiffs' rights under the First Amendment by engaging in unlawful retaliation when it prevented Plaintiffs from being in the championship photograph and withheld their award medals;

**(C)**    A permanent injunction requiring Defendants to deliver to Plaintiff Alexa Anderson her rightfully earned award medal from the 2025 State Track and Field Championship;

**(D)**    An award of nominal damages and other monetary relief as permitted by law;

**(E)**    Plaintiffs' reasonable costs and expenses of this action, including attorneys' fees under 42 U.S.C. § 1988; and

**(F)**    Any other and further relief as this Court deems just and equitable.

## Jury Demand

Plaintiffs hereby demand trial by Jury on all claims so triable.

/s/ *Herbert G. Grey*
Herbert G. Grey, OSB #810250
4800 SW Griffith Drive, Suite 320
Beaverton, OR 97005-8716
Telephone: 503-641-4908
Email: herb@greylaw.org

*Counsel for Plaintiffs*

*Of Counsel:*

Jessica Hart Steinmann
(*pro hac vice application forthcoming*)
Leigh Ann O'Neill
(*pro hac vice application forthcoming*)
Andrew Zimmitti
(*pro hac vice application forthcoming*)
Sarah Heath
(*pro hac vice application forthcoming*)
Garrett Greene
(*pro hac vice application forthcoming*)

America First Policy Institute
1455 Pennsylvania Ave N.W., Suite 225
Washington, D.C. 20004
Telephone: 703-755-0944
Email: jsteinmann@americafirstpolicy.com
         LOneill@americafirstpolicy.com
         azimmitti@americafirstpolicy.com
         sheath@americafirstpolicy.com
         ggreene@americafirstpolicy.com